KELLY et al. v. SPRINGFIELD RY. CO. et al.

(Circuit Court of Appeals, Sixth Circuit. March 7, 1899.)

No. 551.

1. PATENTS—INVENTION—ELECTRIC RAILWAYS.
After dynamic-electric machines and electric motors were invented, sufficiently powerful and economical to operate a street railway, there was no invention in combining them with a track and cars by a plan or system previously well known, and which had been unsuccessful solely because the electric machines then in use were defective.

2. SAME.
The only combination shown in the specifications of a patent for an electric railway was one in which the electricity is carried by one insulated rail and the wheels on it to the motor, and back by the wheels and the other rail. There was a suggestion that independent conductors might be used, but no suggestion as to how contact therewith was to be maintained by the moving car; and at that time there was no practical device for maintaining contact with an overhead wire. *Held*, that the patent could not be pieced out, by reference to the art, so as to include in the combination an overhead wire and contact device.

3. SAME.
The Green patents, Nos. 465,407 and 465,432, for an electric railway and means of operating the same, if valid at all in view of the previous state of the art, are confined to a combination in which the electricity is carried to the motor by one insulated rail and the car wheels, and back through the other wheels and rail or the ground, and is not infringed by the overhead wire and trolley-contact system.

Appeal from the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

This is a bill in equity to enjoin the infringement of two patents issued to George F. Green, assignor to Oliver S. Kelly, the complainant herein. The patents are numbered 465,407 and 465,432. The application for the first patent was filed September 15, 1879, and the second patent May 15, 1886. The first patent was issued December 15, 1891, to George F. Green, assignor to Oliver S. Kelly. The drawings and specifications of the patent are shown below.

"Figure 1 is a transverse section of the track and an end elevation of the car. Figs. 2, 3, 4, and 5 are details of the track. The object of my invention is to propel cars rapidly and easily without the annoyance and difficulty of transmitting the source of energy whereby the cars are propelled. I therefore locate my source of electrical energy or means of electric supply at the end of the track, or at any convenient points along the track, and let the engine only travel with the cars. Independent conductors may be used, but I prefer to employ the track rails for conductors, the cars feeding their engine from the track as they travel along. The required electicity may be produced by any of the known methods. The track or rail, being charged from the stationary battery or any other means of electric supply well known in the art, conducts the electric current to the wheels on the cars, and thereby to the engine on the cars. One rail of the track being connected with the positive pole, the other rail may be connected with the negative pole, and the current flows from the battery or other means of electric supply on one side of the

track up into the car through the engine and back on the other side of the track to the battery, making a complete metallic circuit. H is a post or proper support for the railway track, and C is one of the cross-ties whereon the string-rails, E, are mounted. A, B are proper braces for the structure. F, F are the metallic rails mounted on the stringpieces, E and D, and G, G, are insulators to prevent the escape of the electric charge. K is a stationary source of electric energy or means of electric supply in electrical connection with the rails, F, F, or other insulated stationary conductors. L is a car, the wheels, P, whereof are adapted to travel on rails, F, and J is an electric motor mounted upon the car, and supplied with electricity by a metallic connection with the track conductor. Through this motor, which is of any of the common forms in practical use, and well known in the art,—such, for instance, as that described in my patent No. 184,469, dated November 21, 1876,—the electric current flows continuously, and the coils of said motor are constantly excited (except at that instant of time when the current through said coils is being reversed) so long as the poles of said motor are in circuit with the electric generators, whereby a positive and continuous propelling force is transmitted to the driving wheels of the car. When the common form of uniting the ends of the track rails is found insufficient to make good metallic connection from one rail to the other, I use a U-shaped loop, i, of metal, as seen in Figs. 2 and 3, and secure its ends to the rail by solder or otherwise. The projecting U-shaped surface on the block, D, prevents the insulator, G, from becoming wet, because an electric current will run across a wet surface, and escape. The upper side and under side of the block, D, can be covered with a varnish, rubber, or other nonconducting substance. L is an ordinary railway car, but this will be understood to be merely typical. The engine, J,—an ordinary electric motor which furnishes the motive power,—is attached to the car in some proper manner. The electrical current from the stationary source of energy or means of electric supply charges and traverses one of the rails, F, and passes thence to the engine or motor by means of the car wheels, P. After passing the engine or motor, the current is circuited back to the battery by way of the opposite wheel and rail.

"Having, therefore, described my invention, what I claim as new, and desire to protect by letters patent, is:

"(1) The combination, substantially as set forth, of a railway track, one or more stationary means of electric supply, electrical conductors extending from said means of electric supply along the lines of said track, and consisting wholly or in part of the rails thereof, vehicles moving along said track, electro-dynamic motors whose coils are constantly excited so long as the poles

of said motors are in circuit with the means of electric supply, fixed upon said vehicles for imparting motion thereto, and wheels supporting said vehicles upon the track, and also serving to maintain continuous electrical connection between said means of electric supply and motors, substantially as described.

"(2) The combination, substantially as set forth, of a railway track, one or more stationary electric batteries, electrical conductors extending from said batteries along the lines of said track, and consisting wholly or in part of the rails thereof, vehicles moving along said track, electro-dynamic motors whose coils are constantly excited so long as the poles of said motors are in circuit with the electric batteries fixed upon said vehicles for imparting motion thereto, and wheels supporting said vehicles upon the track, and also serving to maintain continuous electrical ·connection between said batteries and motors, substantially as described.

"(3) The combination, substantially as set forth, of a railway track, one or more stationary means of electric supply, electrical conductors extending from said means of electric supply along the lines of said track, and consisting wholly or in part of the rails thereof, vehicles movable along said track, electro-dynamic motors fixed upon said vehicles for imparting motion thereto, and wheels supporting said vehicles upon the track, and also serving to maintain continuous electrical connection between said means of electric supply and said motors, substantially as described.

"(4) The combination of a railway track, one or more stationary means of electric supply, electrical conductors extending from said means of electric supply along the lines of said track, and consisting wholly or in part of the rails thereof, vehicles moving along said track, rotating electro-dynamic motors fixed upon said vehicles for imparting motion thereto, and wheels supporting said vehicles upon the track, and also serving to maintain continuous electrical connection between said means of electric supply and said rotating motors, substantially as described."

Patent No. 465,432 is for substantially the same combination as that shown and claimed in the foregoing, and was only applied for by Green in order to substitute in the combination for the battery a dynamo-electric generator, a change which the patent office refused to permit in the original patent. The second patent did disclose and claim as an additional element of the combination a current controller, placed upon the car, to enable the motorman to shut off and reverse the current. Only one feature of the second patent needs notice. The specifications contain the following: "In case only one rail is insulated, the return current may be taken back by ground as indicated by dotted lines at T, Figure 1, or by means of an independent conductor, as, indicated at U, Figure 1."

The figure 1 referred to is below:

The original application for the first patent, No. 465,407, was filed August 19, 1879. In that application Green said: "This invention relates to the forms of track generally used, but, instead of carrying the engines and their means of supply along on the track, I leave my supply at the end of the track, or at different points on the track, and let the engines travel with the cars; the cars feeding their engines from the track, as they travel along, I charge my track or track rail with electricity produced by any of the known methods of producing electricity, but, instead of carrying the battery or means of supply along on the cars, I leave the battery at convenient stations on the track, and use the track or rail to conduct the [current] circuit to the engines, the wheels on the cars being used to connect the engines on the cars with the track; and, when some independent conductor is not used, I make the rail or track on one side of the car negative, and the rail or track on the other side positive, letting the current flow from the battery on one side of the track up into the car through the engines back on the other side of the track to the battery." And the only claim of importance in this application was the first, which was as follows: "First. The track being used as a cable to connect the engines on the cars with the electric supply at the end of the track or at different stations along the track, as set forth in the foregoing specifications."
. The application remained in the patent office for eleven years. This was due to certain interference proceedings and through delays for which the patentee does not seem to have been responsible. Early in the history of the application, Green, the patentee, sold the invention to Kelly, the complainant. The record shows that in 1856 Green devised a model of an electric railway with a stationary source of electrical supply, a motor upon a car, and a circuit between the two, maintained through the insulated rails and the wheels of the car insulated from each other. Nothing was done by Green thereafter until 1870. In 1875 he completed a larger model of a railway with a motor. He applied for a patent upon the motor in 1876. In 1875 he exhibited this model of a railway, which was about 200 feet in length. The electricity was supplied from voltaic batteries, and the current was conducted from the battery by one insulated rail through the wheels to the motor on the rear, and was returned to the battery by the wheels and the other insulated rail. His shop in which this model was exhibited was visited by a great number of people. Green testifies that the reason why he did not then apply for a patent was that he was not financially able to do so; that he was engaged in an effort to secure capital with which to construct his railway and to procure patents. In 1879 he did interest some one with him, and applied for the first of the patents here in suit. The patent office rejected the claims under the first patent, and an appeal was taken from the decision of the commissioner of patents to the supreme court of the District of Columbia, which allowed four of the five claims which had been rejected. The opinion of the court is to be found sub nomine In re Green, 20 D. C. 237. Green's 1879 railway was 50 or 60 feet long, and the car was large enough to hold 5 or 6 people. The circuit in that was made up by insulated rails and the wheels. Green never made a model of the railway having an overhead wire as a conductor, and never operated such a railway. He testifies that in 1871 he made a sketch showing a street car with an overhead wire and a contact device consisting of two rollers supported above the car. This sketch was seen by several witnesses within the next two or three years after it was made, and these witnesses take the stand, and testify to their having seen the sketch. But no model was ever made in accordance with the sketch, nor is it claimed that Green ever constructed a railway on such a plan.
In reference to the electric railway used by the defendants the following stipulation was entered into: "It is hereby stipulated, for the purposes of this case, by counsel for the respective parties, as follows: First. That the defendants have operated for regular commercial purposes an electric street railway in the city of Springfield, in the Southern district of Ohio, subsequent to the grant of letters patent of the United States, Nos. 465,432 and 465,407, mentioned in the bill of complaint herein, and prior to the filing of the said bill of complaint. The defendants have continued to operate, and are still operating, the said electric railway. Second. That the said electric railway, operated as

aforesaid by the defendants, is constructed in accordance with the diagram put in evidence, and marked 'Complainants' Exhibit Diagram of Defendants' Electric Railway,' wherein A indicates a stationary source of electric supply, consisting of a dynamo-electric machine of the ordinary Westinghouse type. The positive pole of the dynamo is connected electrically with an insulated trolley wire, B, extending along the line of the road, and insulated and suspended over the street in the customary manner. The cars, one of which is shown

COMPLAINANTS' EXHIBIT.
DIAGRAM OF DEFENDANT'S ELECTRIC RAILWAY.

in the diagram at C, are equipped with a trolley of the ordinary so-called 'Nuttall' type, making a traveling underneath contact with the trolley wire, B. From the trolley the electrical circuit passes through a rheostat, D, a reversing switch, E, the armature, a, field magnets, m, of the electro-dynamo motor, M, and thence through the wheels of the car to the track rails, which are connected electrically with the negative pole of the dynamo, A. The motor is of the ordinary Westinghouse type, series wound, and comprising field magnets and a rotating armature, which drives the car by gearing between the armature and axle. The circuit is indicated on the diagram by arrows, and may be traced from part to part in detail as follows: From the positive pole of the dynamo to the trolley wire, the trolley, the rheostat, one member of the reversing switch, the armature of the motor, the second member of the reversing switch, the field-magnet coils, and thence through truck frame and wheels of the car to the rails and the negative pole of the dynamo. By throwing the reversing switch into the dotted-line position, the direction of the current in the armature of the motor is reversed relatively to that in the field magnets, so that by operating the reversing switch the rotation of the armature and the movement of the car may be reversed at will."

The circuit court, after a hearing on the merits, found that the defendant railway did not infringe the patents in suit, and dismissed the bill. 81 Fed. 617. From this decree the defendants appeal.

Julian C. Dowell, for appellants.
Thomas B. Kerr and James H. Hoyt, for appellees.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

TAFT, Circuit Judge (after stating the facts as above). The combination here patented consists of the following elements: First, a railway track; second, stationary means of electric supply; third, electrical conductors extending from said means of electric supply along the lines of the track, and consisting wholly or in part of the rails thereof; fourth, vehicles moving along said track; fifth, electro-dynamic motors, whose coils are constantly excited so long as the poles of said motors are in circuit with the means of electric supply fixed upon said vehicles for imparting motion thereto; and, sixth, wheels supporting said vehicles upon the track, and also serving to maintain continuous electrical connection between said means of electric supply and motors, substantially as set forth. As early as 1840, a patent was issued to one Pinkus, in England, for the application of electricity to locomotion of vehicles, including railway cars. In the specifications he provided a stationary source of supply of electricity, a motor upon the car, to be actuated by the electric current, and two parallel electrical conductors extending along the track between the rails to maintain the electrical circuit between the stationary source of supply and the motor. The connection between the car and the conductors was maintained by two so-called electro-magnetic slides, which, being attached to the car, were intended to trail or slide along on the conductors, maintaining constant contact and an unbroken circuit. Five years later—in 1845—an article was published in the Mechanic's Magazine, in which it was suggested that a plan for an electric railway was feasible in which there should be a stationary source of supply, and a motor upon the car, and that the electrical circuit between the source of supply and the motor on the car might be maintained by using the rails of the

track and the wheels as conductors. In 1847, a Dr. Colton, a popular lecturer on scientific subjects, in order to show the possible applications of electricity as a force, devised, in conjunction with one Lilly, a machinist, a model of an electric railway. He built a circular track six feet in diameter, insulated the rails, placed thereon a car upon which was a motor consisting of two electro-magnets with an armature over each, by the reciprocating operation of which, motion was given to a crank that turned cogwheels geared with the wheels of the car. The current was carried by a wire from the positive pole of the battery to one of the rails of the track, through the wheels traversing that track to the motor, and thence through the wheels on the other rail to that rail, and thence by wire to the battery again. This model, in operation, was exhibited, and its principle explained, by Dr. Colton, in all the large cities of the country, to 50,000 people, and descriptions of it appeared in all the daily papers of that day and in the Scientific American and other scientific publications. In 1853 an English patent was issued to Dugmore and Millward for electric signaling from one train to another, in which is suggested as a practical alternative mode of carrying the current from one train to the other the use of the rails of the track and the wheels of the locomotive on each train to maintain the electrical circuit. In 1855, in a patent issued to one Guyard for a method of signaling between trains, as an alternative method, is suggested a circuit consisting of an overhead wire, a contact device on the cars, and a return by way of the wheels and the rails and the earth. In the Wesson's United States patent, issued in 1857, for communicating signals from a station to a moving train, the suggestion is made that the electricity could be carried to the train by means of the insulated tracks. In an English patent to Clark, of 1864, for electric generators and motors, rails and wheels were used to carry the current from a stationary source of supply to the motor on a railway car and back again. There are other suggestions of the same kind between 1864 and 1879, when Green applied for the first patent in suit.

Counsel for complainant object vigorously to all these references to the prior art as grounds for denying novelty to Green, for the reason that none of the devices were operative, or commercially available for the construction of a street railway. This is probably true. Prior to 1872, the expense attending the production of electricity sufficient to run a street railway by any of the then known methods was so enormous as to make an electric railway an impossibility. It was not until 1867 or 1868 that a practical machine for turning electricity into propelling force was devised which was powerful enough to move the modern street car. Given a practical stationary source of electrical supply, and given a practical motor, the prior art was full of practical suggestions of the method Green afterwards adopted by which the current might be carried from one to the other without interrupting the progress of the traveling car. Green does not narrow his combination to the use of any particular method of producing electricity, but includes therein any well-known method. He does narrow somewhat his motor to one whose coils

are constantly excited so long as the poles of the motor are in circuit with the means of electric supply. This was, however, the common and best class of motor in use then, and is still. Green does not and cannot claim in this patent any novelty for either his source of supply or his motor. The gist of his invention, if he made any, is in the system or plan by which he brought into correlation a practical stationary source of electricity and a practical electrical motor for changing the current into propelling force. After dynamic-electric machines and electric motors were invented which would do the work required, then Green united them by a plan or system which had previously been unsuccessful solely because the electric machines then known were defective. Did it involve an exercise of the inventive faculty to substitute good machines in the combination for defective ones when the functions to be performed had been clearly outlined in the prior art? Was there anything new discovered in the quality of the electric fluid to be conveyed which made the problem of conveying it from a practical electricity-making machine to the practical force-producing machine on the moving car any different from the problem when the machines were defective and feeble, but the possibility of their perfection was conceived of, and confidently predicted? We have found nothing in the record, or in the arguments or briefs of counsel, or in a careful consideration of the patents themselves, that will justify an affirmative answer to these questions. The additional element of a current controller in the combination of the second Green patent, and the suggestion therein that a dynamo might be used as a source of supply, do not save that patent from the fatal defect of a lack of invention. As far back as 1840, the Pinkus patent included in the combination there proposed a motor which had a current controller. The advantage of means for reversing the current and the motion of the car would seem to have been so obvious that it could not have involved an exercise of the inventive faculty to add it here when such means had been shown in the prior art.

There is satisfactory evidence that Green made a working model of his electric railway in 1875, and that he exhibited it to many thousand people at his shop. Green says that he conceived his invention in 1856, when he constructed and operated a small circular electric railway very like that of Lilly and Colton. Defendants attack complainant's patent, which was not applied for until 1879, on the ground that his railway of 1875 was in public use more than two years before his application. Without passing on this issue, it suffices to say that Green's earlier conceptions of his plan do not aid his case, for the Pinkus, the Lilly and Colton, and the Dugmore and Millward suggestions of a system including a stationary source of supply combined with a motor on the car and an electrical circuit of the rails and wheels were made prior, even, to the first conception by Green of his system in 1856. It cannot be too emphatically stated that Green's claims in these patents are for combinations of parts, and not for the parts themselves. He had secured a patent for a motor prior to making his application for the first of the patents now in suit, but the invention involved in devising that ma-

chine is of no moment in considering the question of invention in the combination, for it is not claimed that the peculiarities of that motor presented any new problem of carrying the current to the poles of the motor from a stationary source of supply. We think, therefore, that Green's patents are void for want of patentable invention.

But, even if Green's patents could be sustained, it could only be on the ground that the combinations patented are to be distinguished from those shown or obviously suggested in the prior art by the fact that with the new machines for making electricity, and new machines for converting it into propulsive force, the combination was operative, and could be actually used to run a street railway. The scope accorded to the claims must, therefore, be limited strictly to the combination disclosed in his patent, which could be made practically operative by following the directions of the specifications. The only combination thus shown in the specifications is one in which the electric fluid is carried by one insulated rail and the wheels on it to the motor, and back by the wheels on the other rail, and that rail either insulated or grounded so as to permit either a complete metallic circuit or an earth return. There is a suggestion in both patents that independent conductors may be used, but there is no suggestion as to how the contact between those conductors and the moving car is to be maintained, unless the specifications are to be construed as meaning that conductors are to be used so connected with the rails that the wheels may still be used as contact devices. The defendant does not insulate either rail, and uses an overhead wire with an under-running trolley contact. It is contended by counsel for the complainant that it is permissible to imply in his specifications the use of any contact device then known in the art for keeping continuous connection between the independent conductor and the moving car. What contact devices were then known in the art? We are referred to the one shown in the Pinkus patent, called by the patentee an "electro-magnetic slide." But it is quite clear that such a slide could not be used with an overhead wire used in defendants' railway without changes involving much more than mechanical skill. And it is quite probable that the Pinkus device, even as used, would not be of any practical value. The fact is that in 1879 there was no contact device known in the art, capable of use with an independent conductor, especially an overhead wire, which had been proven to be practically operative. Green had never used one on his railway models, and, although he shows a sketch, made, as he says, and as attesting witnesses say, in 1871, in which an overhead wire and a contact device of double rollers are shown, he never made such a conductor, or such a contact device, or demonstrated their operativeness; and when he applied for a patent he failed to disclose either overhead wire or contact rollers. The history of the art of electric railways is made up in three great steps: First, the invention of a machine or motor for converting the electric fluid into propulsive force without material loss; second, the invention by Gramme of an electric generator which would produce the electric fluid in great quantity and high intensity at such a price as to make the operation of heavy

street cars commercially possible and profitable; and, third, the invention of a practical contact device for keeping constant the connection between the overhead wire used for carrying the positive electricity and the moving car. This last device was invented by Van De Poele in 1886 or 1887, and is called the "under-running trolley." Other contact devices were invented and known before Van De Poele's, but, although cars could be moved by them, they did not prove to be efficient, or really practical. When Green applied for his patent, in 1879, so far as this record shows, there was no operative and practical contact device known to the art for connecting moving cars electrically with an overhead wire. It therefore follows that the indefinite suggestion of independent conductors in Green's patents cannot be enlarged or pieced out by reference to the art to make an operative combination of that which we find in defendants' railway, to wit, a stationary source of electrical supply, a circuit consisting of an outgoing current to the car by an overhead wire and a suitable contact device, and a return circuit by the wheels and the rails or the earth. A careful reading of the history of Green's patent in the 12 years his application was pending in the patent office, leaves no doubt in our minds that the combination for which Green intended to procure a patent, and the only one he did intend to patent, and the only one he was entitled to have patented, if any, was a circuit in which the rails were to form the conductors, and the wheels were to be the collectors or contact devices. The really accidental reference to independent conductors contained in the original application of Green was made the unfounded basis as the art progressed, and as the fact that success was to lie with the overhead conductor became plain, for changes of language in the specifications and claims which give color to the argument that the combination intended and disclosed by Green when he filed his application really included independent conductors and other contact devices than the wheels. We concur, therefore, in the view of the judge of the circuit court that the defendants' railway does not infringe the patents of the complainant. The decree of the circuit court dismissing the bill is affirmed.